## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ALEJANDRINA OCAMPO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 4054 |
| | ) | |
| | ) | Magistrate Judge Nan R. Nolan |
| PAPER CONVERTING MACHINE CO. | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HANDI-FOIL CORP. | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

In this product liability case, plaintiff Alejandrina Ocampo sued defendant Paper Converting Machine Company ("PCMC") for severe personal injuries Ocampo sustained when she was twenty-one years old after her hair was pulled into an aluminum foil interfolder machine manufactured by PCMC. Specifically, on December 21, 2001, while Ocampo was maintaining and inspecting the machine, her hair got caught in the machine, resulting in her scalp being torn from her head (also known as avulsion of the scalp). In her lawsuit, Ocampo alleged that the aluminum foil interfolder machine, model number 7974, was defective and unreasonably dangerous because it (i) did not have a guard on the operator side to prevent entry while the machine was running and (ii) did not have a guard over the transfer motion shaft in the folding unit to prevent contact with the shaft while the machine was running. PCMC denied liability, maintaining, among other defenses, that Ocampo had knowingly and voluntarily assumed the risk

of injury when she climbed into the aluminum foil interfolder machine while it was running. PCMC also filed a third-party complaint against Ocampo's employer, Handi-Foil Corporation ("Handi-Foil") for contribution, alleging that Handi-Foil failed to provide Ocampo with a safe working environment, failed to adequately instruct Ocampo, failed to adequately supervise her, and was otherwise negligent.

The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the matter later went to trial. During trial, at the close of the evidence presented by Ocampo and PCMC, Handi-Foil made an oral motion for judgment as a matter of law, which the court denied. The court also denied PCMC's motion for a mistrial, which was based on a comment made during Handi-Foil's closing argument. The jury subsequently returned a verdict in favor of Ocampo on her product liability claim against PCMC, and in favor of PCMC on its contribution claim against Handi-Foil. The jury found that Ocampo's damages for medical care, pain and suffering, disfigurement and loss of normal life totaled $6.1 million. In apportioning responsibility for Ocampo's injuries, the jury concluded that Ocampo was 8% responsible, PCMC was 67% responsible, and Handi-Foil was 37% responsible. Accordingly, the jury reduced Ocampo's total damages by her percentage of liability (8%), and awarded her a total of $5,612,000 in recoverable damages.

Both PCMC and Handi-Foil filed post-trial motions requesting relief from the verdict, which are now before the court for ruling. PCMC filed four separate motions for a new trial under Rule 59 of the Federal Rules of Civil Procedure: (1) PCMC's motion for a new trial on grounds that the verdict was excessive; (2) PCMC's motion for a new trial based on the court's exclusion of a prior reprimand issued to plaintiff; (3) PCMC's motion for a new trial based on

the court's refusal to instruct the jury on the misuse defense and refusal to include special interrogatories; and (4) PCMC's motion for a new trial based on the court's denial of its mistrial motion. Handi-Foil filed two post-trial motions under Rules 50 and 59: (1) Handi-Foil's motion for a new trial, amendment of verdict, and judgment notwithstanding the verdict (*i.e.*, judgment as a matter of law); and (2) Hand-Foil's motion to reduce the its contribution exposure pursuant to *Kotecki v. Cyclops Welding Corp.*, 585 N.E.2d 1023 (Ill. 1991) ("*Kotecki* motion").[1] For the reasons explained below, all of PCMC's post-trial motions are denied, as is Handi-Foil's motion for a new trial, amendment of verdict, and judgment notwithstanding the verdict. Handi-Foil's *Kotecki* motion, however, is entered and continued for an additional hearing.

## I.    PCMC'S POST-TRIAL MOTIONS

PCMC has asked the court to grant a new trial under Rule 59(e) on several grounds. The decision whether to grant a new trial lies within the sound discretion of the trial court, and should be granted only "if the verdict is against the clear weight of the evidence, the damages are excessive, or the trial was unfair to the moving party." *Miksis v. Howard*, 106 F.3d 754, 757 (7th Cir. 1997). PCMC's motions fall in the latter two categories. In its first motion, PCMC argues the verdict was excessive, whereas in the remaining three motions—which challenge the court's decisions to bar certain evidence, to deny certain jury instructions and special interrogatories, and

---

[1] In styling their motions, both PCMC and Handi-Foil stated that the motions were also brought under Rule 60 of the Federal Rules of Civil Procedure. Neither PCMC nor Handi-Foil cited any grounds for relief under Rule 60, however (*e.g.*, mistakes, inadvertence, excusable neglect, newly discovered evidence, etc.). Nor do any of the grounds for relief from judgment under Rule 60 seem applicable here. In any event, because both PCMC's and Handi-Foil's motions were filed within the 10-day period set forth in Rule 59(e), and because the grounds for relief under Rule 59(e) are broader than under Rule 60(b), *Tango Music, LLC v. Deadquick Music, Inc.*, 348 F.3d 244, 247 (7th Cir. 2003), the court analyzes the motions under Rule 59(e).

to deny PCMC's motion for a mistrial—PCMC essentially argues that it did not receive a fair trial.

### A. PCMC's & Handi-Foil's Motion for a New Trial on Grounds That the Verdict Was Excessive

PCMC first argues that the amount of the verdict was excessive, warranting either a new trial or remittitur of the jury's award. Because Handi-Foil makes a similar argument in its motion for a new trial, the court addresses PCMC's and Handi-Foil's arguments together. In closing arguments, Ocampo's attorneys sought approximately $6.1 million in damages—$2.5 million for pain and suffering, $2.5 million for disfigurement, $1 million for loss of normal life, and approximately $600,000 for medical expenses, both past and future. PCMC chose not to submit any evidence regarding damages, nor to contest the plaintiff's evidence; PCMC likewise did not challenge the plaintiff's proposed damages number during closing arguments, aside from saying that plaintiff was asking for a lot of money. The jury's verdict mirrored the amount requested by Ocampo's attorneys, finding that Ocampo's total damages were $6.1 million: $2.5 million for pain and suffering, $2.5 million for disfigurement, $1 million for loss of normal life, and $600,000 for past and future medical expenses. The jury reduced that amount by 8%—Ocampo's percentage of fault—for a total verdict of $5,612,000 in favor of Ocampo.[2] In challenging that verdict, PCMC argues that either there should be a new trial on damages, or the verdict should be remitted to $2.6 million: $1 million for pain and suffering, $1 million for

---

[2]Although the jury valued Ocampo's total damages as $6.1 million, that amount was reduced by 8%—Ocampo's percentage of fault—to a final verdict of $5,612,000.

4

disfigurement, $600,000 for past and future medicals, and $0 for loss of enjoyment of life.[3] Alternatively, PCMC contends that, at the very least, the court should consider whether the damages the jury awarded for loss of enjoyment of life and disfigurement are impermissibly duplicative. Handi-Foil, on the other hand, argues that the verdict should be remitted to $875,000 based on a report in the Chicago Daily Law Bulletin that, until the verdict in this case, the highest award for a scalping injury according to the Cook County Verdict Reporter was $875,000 awarded in January 1998 to a twenty-five year old woman whose scalp was torn off after her hair was caught in an industrial drill. Ocampo contends that the jury's verdict should stand.

Federal standards determine whether a verdict is excessive, even in diversity cases like this one.[4] *Miksis*, 106 F.3d at 764. In evaluating a jury's award of damages, federal courts "will vacate a damages award only if it is 'monstrously excessive,' considering whether it is out of line with verdicts in similar cases, or if it bears no rational connection to the evidence."[5] *Id.* Here, the court first addresses whether the verdict, as a whole, is excessive, then turns to the issue of whether awarding separate damages for loss of enjoyment of life and disfigurement was impermissibly duplicative. For the reasons that follow, the court concludes that there is no basis to vacate the jury's verdict as excessive.

---

[3]PCMC argues for remittitur to $2.6 million. PCMC does not specify whether that number should be Ocampo's damages before reduction for her liability, or Ocampo's total recoverable damages after reduction. In the absence of an argument to the contrary, the court presumes that PCMC seeks remittitur to $2.6 million for total recoverable damages after reduction for Ocampo's liability.

[4]In the original briefing, PCMC relied on Illinois law; Handi-Foil cited no law on the issue of excessive verdicts in its opening brief.

[5]Illinois courts, on the other hand, traditionally decline to use comparisons to determine whether a jury award is excessive. *Richardson v. Chapman*, 676 N.E.2d 621, 628 (Ill. 1997).

### 1. The Verdict as a Whole

Regarding the verdict as a whole, both PCMC and Handi-Foil contend that the $5,612,000 verdict rendered here is excessive and should be reduced. In support of their arguments for remittitur, both PCMC and Handi-Foil cite to cases in which the plaintiffs received substantially less money than Ocampo. Although federal courts may consider verdicts in similar cases in determining whether a verdict is monstrously excessive, *id.*, such comparisons are not flawless. Indeed, as Judge Kennelly has thoughtfully explained, there are inherent limitations in relying on comparable cases. *DeLoughery v. City of Chicago*, No. 02 C 1125897, at *4-5 (N.D. Ill. May 20, 2004); *Zurba v. United States*, 247 F. Supp. 2d 951, 961-962 (N.D. Ill. 2001). For one thing, it is problematic to determine the reasonableness of an award based on comparisons to other cases because the reported cases are "but a fraction, and maybe a small fraction, of the universe of jury awards; many cases are not appealed at all, and many others are settled post-verdict." *DeLoughery*, 2004 WL 1125897 at *5. What is more, the description of evidence found in reported cases generally does not allow a court to realistically evaluate whether the cases are truly comparable. *Id.* As for cases reported in jury verdict reporters, the descriptions are typically even less detailed. Reliance on other reported cases and cases written up in jury verdict reporters thus provides "at best a blunt instrument in helping a fact finder determine what damage award is appropriate." *Id.* (quoting *Zurba*, 247 F. Supp. 2d at 961). Further, reliance on other awards is even more problematic when the case at bar involves damages for intangibles such as pain and suffering because "[t]here is no exact standard for fixing damages for pain and suffering . . . . It is impossible to know all of the factors that led a jury or judge to make a particular award for pain and suffering in a particular case. The fact finder's observation and

6

assessment of the plaintiff at trial, for example, may be a significant factor affecting the award upward or downward, but this factor is unlikely to be assessed in any source to which a court would look in attempting to determine comparability." *Id.* (quoting *Zurba*, 247 F. Supp. 2d at 961-962). In evaluating damages for physical and emotional pain and suffering, courts "must be willing to accept variations in how juries will assess those damages in different cases." *Id.*

Keeping in mind the limitations of looking to comparable cases, the court turns to the case referenced in the Daily Law Bulletin that both PCMC and Handi-Foil cite in support of their arguments for remittitur.[6] After the verdict was rendered in Ocampo's case, the Daily Law Bulletin reported that:

> According to records kept by the Cook County Jury Verdict Reporter, [the award in Ocampo] eclipses the previous record for an injury of its kind. In January 1998, a jury in Cook County Circuit Court awarded $875,000 to a 25-year old woman whose scalp was torn off after her hair was caught in an industrial drill.

*Chicago Daily Law Bulletin*, February 17, 2005. As an initial matter, the statement in the Daily Law Bulletin regarding the case was not entirely accurate. For one thing, according to the information provided by Handi-Foil, that case—captioned *Garcia v. Dexter-Lawson Mfg., Inc.*, 94 L 3165—ended as the result of a settlement, not a jury verdict: the jury deadlocked and never reached a verdict. Additionally, the plaintiff received more than $875,000 in settling her case. Prior to trial, the plaintiff settled with the company that reconditioned the machine for $875,000

---

[6]PCMC also relies on two settlements reported in the Jury Verdict Reporter. One of those cases involved a newborn baby who suffered a laceration to her scalp during delivery, which left a portion of her scalp hairless for life. The case settled for $375,000. The second involved a nine-year old girl who was attacked by a dog and suffered numerous bites and lacerations to the face, forehead and ear, resulting in extensive scarring and trauma. That case settled for $225,000. The court finds that neither of those cases are sufficiently comparable to Ocampo's case to warrant discussion. (For example, in the case involving the newborn, there was a dispute as to whether the hairless area of the scalp was a congenital problem, and whether the laceration occurred because of a defect in the scalp.)

and settled with her employer for waiver of a $109,000 workers' compensation lien, then settled with the manufacturer of the machine for an additional $300,000 after the jury deadlocked. Thus, without counting the lien waiver, the plaintiff received a settlement of $1,175,000. That settlement is obviously substantially less than the $5,612,000 verdict in favor of Ocampo, but the difference does not necessarily render the Ocampo verdict monstrously excessive.

Although Ocampo did not refer the court to any cases, the court's own research reveals several cases in which plaintiffs, like Ocampo, sustained severe injuries after being scalped by a machine. The verdicts and settlement amounts in those cases varied.[7] At the lower end, there was an Ohio case involving a 30-year old male that settled for $700,000 in 2001[8] and a New England case involving a 24-year old male that settled for $900,000 in 2003.[9] *Anonymous Mach. v. Anonymous Mach. Shop & Anonymous Distrib.*, 2001 WL 1763341 (Ohio Com. Pl.); *Plaintiff v. Defendant*, 1000 WL 39599 (Unknown State Ct.). But there were also cases in which the plaintiffs recovered significantly higher amounts.[10] For example, a case involving a 34-year old

---

[7]In conducting its research, the court looked at cases from across the country. *See Frazier v. Norfolk & W. Ry Co.*, 996 F.2d 922, 926 (7th Cir. 1993) (when reviewing comparable cases, awards from other jurisdictions may properly be considered).

[8]The Ohio case involved a 30-year old male whose scalp was torn off his head after his ponytail got caught in a machine at work. *Anonymous Mach. v. Anonymous Mach. Shop & Anonymous Distrib.*, 2001 WL 1763341 (Ohio Com. Pl.).

[9]The New England case involved a 24-year old male who suffered complete, traumatic avulsion of the scalp after his long hair and clothing were caught in a machine. *Plaintiff v. Defendant*, 1000 WL 39599 (Unknown State Ct.).

[10]There were also cases involving avulsion of the scalp where the settlements fell in the $1 million to $2.5 million range. In a 1987 Cook County case, a 28-year old woman whose sustained avulsion of the scalp settled her case for $1 million—the equivalent of a settlement exceeding $1.7 million after adjusting for inflation. *Overbey v. Baker Bros., Inc.*, 1987 WL 364685 (Ill. Cir. Ct.). A forty-seven-year old female plaintiff settled a similar claim for $1,050,000 in 1997. *Baldock v. Unisys Corp.*, 1997 WL 33346534 (Unknown State Ct.). And in 2002, a 26-year old female factory worker settled her claim for $2.5 million. *Loveland v. Stone Container Corp.*, 2002 WL 32128224 (Fla. Cir.

woman whose hair got caught in the rotating shaft of a machine settled for $3.9 million before trial in 2003. *York v. Klockner Capital Corp.*, 2003 WL 22095642 (Mo. Cir. Ct.). In another scalp avulsion case involving a 24-year old woman, the jury awarded the plaintiff $2 million in 1989. When adjusted for inflation, that is the equivalent of a verdict in excess of $3.2 million in 2005.[11] *Wilkes v. F.L. Smithe Mach. Co.*, 1989 WL 390702 (Va. Dist. Ct.). And in a 1984 California case in which the plaintiff had been scalped by a machine, the jury awarded the 30-year old woman $2.5 million—which is the equivalent of a verdict of more than $4.7 million after adjusting for inflation. *Martinez v. C&C Buff Co.*, 1984 WL 320151 (Cal Superior Ct.).

The jury's verdict for Ocampo admittedly was higher than any of the verdicts and settlements the court's research uncovered. However, given the paucity of facts available about the other scalp avulsion cases, it is difficult to assess how comparable those cases really are, apart from involving the same type of accident. The court, for example, has no way of assessing what percentage of comparative negligence, if any, was attributable to the plaintiffs in those cases. In the case at bar, the jury determined that Ocampo bore minimal responsibility (only 8%) for the accident. In the *Garcia* case cited by PCMC and Handi-Foil, on the other hand, it is impossible to determine the percentage of liability that was attributable to the plaintiff. The same holds true for the cases the court found. As a result, those purportedly comparable cases provide "'at best a blunt instrument in helping [the court] determine what damage award is appropriate.'" *DeLoughery*, 2004 WL 1125897 at *5 (citation omitted). Furthermore, even assuming the cases

---

Ct.).

[11]To calculate a rough estimate of the present dollar value of older verdicts and settlements, the court used an inflation rate of 3.04%, based on the average of average annual inflation rates since 1988.

are sufficiently comparable, "[t]here is no rule that the highest reported verdict [or settlement] that can be found sets the cap for future awards." *DeLoughery*, 2004 WL 1125897 at *7.

Additionally, although the verdict is substantial, the court cannot conclude that it bears no rational relationship to the evidence. At trial, the jury saw photographs of the gruesome injuries Ocampo sustained when her scalp was completely torn off after her hair got caught in the aluminum foil interfolder machine. The jury also learned that after the accident, Ocampo was hospitalized for one month, where she was ventilated and intubated and had to undergo skin grafts because the skin at the place of the injury could not be salvaged. Ocampo has had four separate surgeries to reconstruct her ear, which was also torn off. The surgeries were complex and painful, and there are still at least four reconstructive surgeries yet to come. After the accident, Ocampo had nightmares and sought psychiatric help for a variety of issues, including posttraumatic stress disorder. She also covered the mirrors with towels to avoid seeing herself, wore a hat to cover the bandages, and would not leave her apartment except for doctor's appointments. Ocampo now wears a wig, which she must remove at night. Her ear is disfigured, and she cannot move her forehead. Although she occasionally goes out now, she does not go out as much as she did before the accident. Ocampo's sister described her as depressed, and says she now prefers to stay home rather than go out. In addition to having significant physical scarring, Ocampo further testified that she feels scarred on the inside as well. Based on this evidence and other evidence introduced at trial, the jury could have reasonably concluded that the facts warranted a multi-million dollar verdict.

After considering other scalp avulsion cases and the evidence presented at trial, the court finds that the jury's verdict falls roughly within the acceptable range, particularly because this

10

case involves damages for intangibles such as disfigurement, pain and suffering, which, by their very nature, are not amenable to formulaic calculations. Accordingly, finding that the verdict bears a rational relationship to the evidence and is not monstrously excessive, the court denies PCMC's and Handi-Foil's requests for remittitur, or alternatively, for a new trial on damages.[12]

## 2.    Separate Damages for Loss of Enjoyment of Life and Disfigurement

On the verdict form, the jury itemized Ocampo's damages into the following four separate and compensable elements of damages: medical expenses (past and future), pain and suffering, disfigurement, and loss of a normal life. In seeking remittitur, PCMC argues that, at a minimum, the court should vacate the portion of the jury's award to Ocampo for loss of enjoyment of life because that award is duplicative of the award for disfigurement. The court rejects PCMC's argument, however, finding no basis for remittitur or for a new trial on damages.

According to PCMC, there is no distinction between disfigurement and loss of normal life. The court construes this argument to mean one of two things: either that loss of normal life is not a separate and compensable element of damages, or that loss of normal life does not fit the facts of Ocampo's case. Neither position is persuasive. Under Illinois law, both disfigurement and loss of normal life are separate and compensable elements of damages. This conclusion is clear from the case law as well as the Illinois pattern jury instructions. The Illinois Supreme Court recognizes disfigurement, disability, and pain and suffering as three separate and

_____

[12]The court further notes that the jury's calculation of Ocampo's damages before deducting for her percentage of fault totaled almost the exact amount that Ocampo's counsel requested in closing argument. PCMC made a strategic decision not to suggest an alternative damages number. That was PCMC's prerogative, but in making that decision, PCMC "gambled and lost." _Kaspar v. St. Mary of Nazareth Hosp._, 135 F.3d 1170, 1178 (7ᵗʰ Cir. 1998). "A jury cannot be blamed for failing to award an intermediate number if neither party proposes such a figure." _Id._

11

compensable elements of damages. *See Holston v. Sisters of the Third Order of St. Francis*, 650

N.E.2d 985, 997 (Ill. 1995); *Powers v. Ill. Central Gulf R.R. Co.*, 438 N.E.2d 375, 382 (Ill.

1982). Loss of normal life is likewise a compensable element of damages as an alternative to

disability, depending on which term more accurately fits the case at bar. *Turner v. Williams*, 762

N.E.2d 70, 79-80 (Ill. App. Ct. 2001) (discussing loss of normal life as an alternative to

disability); Ill. Pattern Jury Instr.–Civ. 30.04.01 (2005 ed.) ("IPI") (same). The Illinois pattern

jury instructions further demonstrate that loss of normal life is a compensable element of

damages separate and apart from disfigurement. The pattern jury instruction for measuring

damages is IPI 30.01, which essentially states that if the jury finds for the plaintiff on the

question of liability, the jury must award the amount of money that will reasonably and fairly

compensate the plaintiff for the elements of damages that have been proven. When IPI 30.01 is

used (as it was in this case),[13] the instruction must be completed by selecting appropriate

elements of damages from IPI 30.04 through IPI 30.20. IPI 30.01, *Notes on Use*. According to

the IPI, loss of normal life and disfigurement are separate, compensable elements of damages.

---

[13] The instruction given at trial, patterned after IPI 30.01, stated:

If you decide for Ms. Ocampo on the question of liability, you must then fix the amount of
money which will reasonably and fairly compensate her for any of the following elements of damages
proved by the evidence to have resulted from the fault of PCMC and/or Handi-Foil Corporation, taking
into consideration the nature, extent and duration of the injuries.

- The reasonable expense of necessary medical care, treatment, and services
  received and the present cash value of the reasonable expenses of medical care,
  treatment and services reasonably certain to be received in the future.
- The pain and suffering experienced and reasonably certain to be experienced in
  the future as a result of the injuries.
- The disfigurement resulting from the accident.
- Loss of a normal life experienced and reasonably certain to be experienced in the
  future.

Whether any of these elements of damages has been proved by the evidence is for you to
determine.

*See* IPI 30.04 (disfigurement element of damages); IPI 30.04.01 (loss of normal life/disability element of damages). Thus, despite PCMC's argument to the contrary, there is a distinction between disfigurement and loss of normal life.

None of the cases cited by PCMC in supplemental briefing hold otherwise.[14] In *Powers*, the Illinois Supreme Court ruled that the nature, extent and duration of an injury is not a separate and compensable element of damages, but rather is something the jury takes into account in assessing the compensable elements of damages, such as disability, pain and suffering, and disfigurement. *Powers*, 438 N.E. 2d at 156. In *Turner*, the court explained that loss of normal life is an alternative to disability as an element of compensable damages. *Turner*, 762 N.E.2d at 80. Reading *Powers* in conjunction with *Turner* supports the conclusion that disfigurement and loss of normal life are distinct, compensable elements of damages under Illinois law.[15]

If, on the other hand, PCMC's point is that the loss-of-normal-life element of damages does not fit the facts of Ocampo's case[16] and thus should not have been included in the jury instructions and verdict form, PCMC has waived this issue by failing to object at trial. *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 729-730 (7th Cir. 2002) (under Fed. R. Civ. P. 51, to preserve objections to jury instructions, party must make specific objection on the record before the jury is instructed so that the judge can fix any problems before the case goes to the jury).

---

[14]Because PCMC originally provided no caselaw to support its position, after hearing oral argument, the court invited supplemental briefing on the issue.

[15]In the other case cited by PCMC, *Hendricks v. Riverway Harbor Serv. St. Louis, Inc.*, 732 N.E. 2d 757, 765 (Ill. App. Ct. 2000), the court ruled that under federal law damages could not be awarded for both (1) disability/loss of normal life and (2) pain and suffering. *Hendricks* has no bearing on the case at bar, however, which is controlled by state law.

[16]This seems to be PCMC's main point, given its argument that the focus of Ocampo's evidence was on her disfigurement, not loss of normal life.

13

PCMC raised no objection to plaintiff's proposed instruction No. 8, which was patterned after IPI 30.01 and included disfigurement and loss of normal life as separate elements of compensable damages.[17] Nor did PCMC object to the verdict form on the grounds that including separate line items for disfigurement and loss of normal life was improper based on the evidence presented at trial. In fact, although Ocampo, PCMC and Handi-Foil each submitted their own proposed verdict forms, the proposed forms all had one thing in common: each proposed separate line items for (1) medical expenses, (2) pain and suffering, (3) disfigurement, and (4) loss of a normal life. In other words, all of the parties—including PCMC—treated disfigurement and loss of a normal life as separate, compensable elements of damages. It is too late raise a contrary argument.

In any event, there was a basis in the evidence to identify loss of a normal life as one of the separate and compensable elements of damages. *See* IPI 30.01 (the measure of damages instruction, which calls for insertion of elements of damages that have a basis in the evidence). Loss of a normal life means "the temporary or permanent diminished ability to enjoy life. This includes a person's inability to pursue the pleasurable aspects of life." IPI 30.04.02 (defining loss of a normal life). PCMC suggests there was no evidence that Ocampo lost the ability to have a normal life, explaining that although Ocampo will likely wear a wig for the rest of her life, she married, has a child, and is pregnant with her second child. The court, however, agrees with Ocampo that PCMC's characterization of the evidence takes a narrow, rather insensitive view of the trauma Ocampo endured and the impact of that trauma on her life. As described earlier, and by way of example only, there was evidence that after the accident, Ocampo avoided looking at

---

[17]*See supra* note 12 for the language of the instruction.

14

herself in a mirror, had nightmares, and suffered post-traumatic stress, and that even now, she avoids going out in public, feels emotionally scarred, and is depressed. Such evidence demonstrates a loss of ability to enjoy life.

For the reasons explained above, the court finds no error in allowing the jury to award separate damages for disfigurement and loss of a normal life. The court therefore denies PCMC's motion for remittitur, or alternatively, a new trial to the extent the motion asserts that the verdict was duplicative.[18]

## B. PCMC's Motion for a New Trial Based on the Court's Exclusion of a Prior Reprimand Issued to Plaintiff

PCMC also argues that a new trial is warranted because the court excluded evidence of a prior reprimand that was issued to Ocampo. In essence, PCMC contends that it received an unfair trial. Because PCMC claims the court erred in barring evidence, the court considers the

---

[18]In supplemental briefing, Handi-Foil also addresses the issue of whether awarding damages for loss of normal life and disfigurement was duplicative—even though Handi-Foil has not previously challenged the verdict on those grounds. Handi-Foil argues for the first time that, as a matter of law, the court committed reversible error by instructing the jury on disfigurement and loss of normal life as separate, compensable elements of damages. There are several flaws in Handi-Foil's argument. First, Handi-Foil waived its argument by failing to object at trial. Like PCMC, Handi-Foil raised no objection to the relevant jury instructions at trial, nor did it object to itemizing loss of a normal life and disfigurement as separate, compensable elements of damages on the verdict form. *See Schobert*, 304 F.3d at 729-730. Second, even if Handi-Foil had objected at trial, it failed to raise the issue in its post-trial motion until supplemental briefing, which also constitutes waiver of the argument. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (argument waived for first time in reply brief is waived). Third, Handi-Foil is simply wrong. Handi-Foil contends that a jury should not be instructed on both disability/disfigurement and loss of normal life as a matter of law. In making this argument, Handi-Foil incorrectly equates *disability* with *disfigurement*: disability is an alternative to loss of normal life, not disfigurement. *See* IPI 30.04.01 (disability is an alternative to loss of normal life; disability/loss of normal life is a compensable element of damages); IPI 30.04 (disfigurement is a separate element of compensable damages in Illinois). As the court has already discussed, and as the IPI instructions and cases cited by Handi-Foil teach, under Illinois law, jury instructions should not be given on both disability and loss of normal life. IPI 30.04.01 (either disability or loss of normal life should be used, not both). However, jury instructions may be given on both loss of normal life and disfigurement because those are separate, compensable elements of damages under Illinois law. *See* IPI 30.04 and 30.04.01.

Rule 59 motion in conjunction with Rule 61, which provides: "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order . . . is a ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice." *Grove Holding Corp. v. First Wisconsin Nat'l Bank of Sheboygan*, 12 F. Supp. 2d 885, 896 (E.D. Wis. 1998) (citation omitted); *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003) (error is harmless unless it had a "'substantial and injurious effect or influence' on the jury's verdict"). As the Supreme Court has long held, a party "'is entitled to a fair trial, but not a perfect one,' for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (citation omitted). For the reasons that follow, exclusion of the prior reprimand did not deny PCMC a fair trial.

But first, before explaining the ruling, some background information is necessary. Ocampo filed a motion *in limine* to exclude (i) evidence that in March 2000 she injured her hand on a box packing machine at work, (ii) evidence that she received an employee warning notice regarding that injury, (iii) and the findings of the employee warning notice. Ocampo argued that evidence suggesting that she had acted negligently in the past should not be admitted to suggest that she acted negligently when her hair got caught in the aluminum foil interfolder machine. PCMC opposed the motion *in limine*, arguing that evidence regarding the prior employee warning is admissible under Rule 404(b) to show "that Ocampo knew that climbing into a machine when it was running was extremely dangerous and in violation of Handi-Foil safety directives and employee policies, and that she willingly assumed that risk when she climbed into the [aluminum interfolder] machine on December 21, 2001." (PCMC's Mem. Opp. Mot. *in*

16

*Limine* at 2.)[19] The court deferred ruling on the motion *in limine* until trial. In later oral argument, in addition to its "knowledge" argument under Rule 404(b) of the Federal Rules of Evidence, PCMC also argued that evidence regarding the employee warning constituted admissible impeachment evidence. During a telephonic conference with the parties on the Friday before trial began, the court gave each side an opportunity to submit supplemental briefing on the issue, but PCMC chose not to file anything. At trial, the court ruled that PCMC's arguments regarding knowledge and impeachment were unpersuasive and that the evidence was likely to confuse the jury. Accordingly, the court granted the motion *in limine* and barred the evidence under Rule 403 of the Federal Rules of Evidence.

In seeking a new trial, PCMC argues that the court's ruling prejudiced its ability to prove its affirmative defense that Ocampo knowingly and voluntarily assumed the risk of injury when she climbed into the aluminum foil interfolder machine while it was running. According to PCMC, evidence regarding the March 22, 2000 reprimand was indispensable to its assumption of risk defense. The court, however, finds no error in its decision to exclude evidence regarding the prior reprimand.

In seeking a new trial, PCMC contends that without evidence of the March 2000 incident, "there was no other means by which PCMC could prove Ocampo's knowledge of the dangerous nature of her conduct . . . ." (PCMC's Mem. at 3-4.)[20] But as the court explained when it granted Ocampo's motion *in limine* to bar the evidence, PCMC's knowledge argument is unpersuasive. Ocampo's knowledge of the risk presented by the aluminum foil interfolder is relevant to

---

[19]*See* docket entry 43.

[20]*See* docket entry 74.

PCMC's affirmative defense that she assumed the risk. The assumption-of-the-risk test is subjective, however, so the issue was whether Ocampo appreciated the risk, not whether a reasonable person would have. *Campbell v. Nordco Prod.*, 629 F.2d 1258, 1262 (7th Cir. 1980); *Varilek v. Mitchell Eng. Co.*, 558 N.E.2d 365, 374 (Ill. App. Ct. 1990). The plaintiff's state of mind need not be proven by direct evidence— circumstantial factors such as the plaintiff's age, experience and knowledge are relevant evidence. *Campbell*, 629 F.2d at 1262. However, "[i]n a product liability case, whether the plaintiff assumed the risk of using a product must refer to using that aspect of the product that is alleged and proven to be unreasonably dangerous." *Varilek*, 558 N.E. 2d at 374. In other words, PCMC had to show that Ocampo appreciated the risk presented by the aluminum foil interfolder, not the risk presented by running machines generally. PCMC offered very limited information regarding the incident in March 2000, but even the limited facts reveal that the injury occurred with a different type of machine. Under the Seventh Circuit's four-part test governing the admissibility of evidence under Rule 404(b), one prong of the test requires that the other act must be similar enough and close enough in time to be relevant to the matter in issue. *E.g., United States v. Penson*, 896 F.2d 1087, 1091 (7th Cir. 1990). Given the difference between the machines, the fact that the box cutting machine incident occurred 21 months before Ocampo's scalping injury, and the paucity of evidence regarding the March 2000 incident, the court lacked a reasonable basis to conclude that the facts relating to the box cutting machine incident were similar enough or close enough in time to be relevant to whether Ocampo had subjective knowledge of the risk presented by the aluminum foil interfolder. The court thus properly rejected PCMC's Rule 404(b) argument.

PCMC also argues that evidence regarding the March 2000 incident was essential to

impeach Ocampo's testimony that she was ordered to climb into the aluminum foil interfolder machine to oil it while it was running—testimony which goes to the issue of whether she voluntarily entered the machine. At trial, Ocampo testified that her supervisor Jose Martinez ordered her to go into the aluminum foil interfolder machine while it was running to oil it, rather than shutting it down, which would cause delays. Martinez denied giving her such an instruction. PCMC wanted to offer evidence regarding the March 2000 incident to rebut Ocampo's testimony because, in PCMC's view, Ocampo's testimony that Martinez directed her to climb into the machine to oil it while it was running or risk being fired "is wholly inconsistent with his issuance of a written reprimand to Ocampo in March 2000 for reaching into a moving machine." (PCMC's Mem. at 3.) PCMC thus suggests the prior reprimand was being offered for impeachment purposes on the issue of the voluntariness of Ocampo's conduct. The court notes that PCMC was given an opportunity to develop this argument in a written brief, with citations to legal authority, before the court ruled on the motion *in limine*, but declined to do so. Its post-trial brief also lacks any legal authority. The evidence does not strike the court as impeaching, given the difference between the machines and the time lapse between the events. Regardless, relevant impeachment evidence can be excluded under Rule 403 if the court decides exclusion is warranted. The court stands by its decision to bar the evidence under Rule 403 out of concern that the jury would be confused and improperly infer that Ocampo had a propensity for negligent conduct.

Finding no error in its decision to bar evidence regarding March 2000 incident, the court denies PCMC's motion for a new trial based on exclusion of the prior reprimand.

19

**C.** **PCMC's Motion for a New Trial Based on the Court's Refusal to Instruct the Jury on the Misuse Defense and Refusal to Include Special Interrogatories**

PCMC also urges the court to grant a new trial based on the court's refusal (1) to instruct the jury regarding PCMC's defense that third-party defendant Handi-Foil's misuse of the foil interfolder machine caused Ocampo's injuries; and (2) to include special interrogatories regarding the misuse defense in the verdict form. As explained below, the court's rulings on these issues were not erroneous, and thus do not warrant a new trial.

Before explaining the ruling, the court first explains the background regarding PCMC's misuse defense. Although PCMC included an instruction on misuse in its proposed jury instructions that were part of the Final Pretrial Order, PCMC withdrew that proposed instruction at the first of several pre-trial conferences. Then, in the middle of trial, on Wednesday, February 9, 2005, PCMC informed the court that it wanted to amend the jury instructions to include an instruction on misuse as an affirmative defense. On Friday, February 11, 2005, PCMC submitted its proposed misuse instruction, a verdict form that included special interrogatories, and a memorandum in support of its proposal. As the court explained in denying PCMC's proposed instruction and verdict form, "[m]isuse of a product is using it for a purpose neither intended nor reasonably foreseeable by the defendant based upon an objective standard." *Varilek*, 558 N.E.2d at 377. To prove misuse, PCMC must demonstrate that its product "was used for a *purpose* neither intended nor foreseeable, rather than in a *manner* neither intended nor foreseeable." *Suich v. H&B Printing Mach., Inc.*, 541 N.E.2d 1206, 1213 (Ill. App. Ct. 1989) (emphasis in original); *Varilek*, 558 N.E.2d at 377. According to PCMC, the court should have given an instruction on its misuse affirmative defense informing the jury that if it found that Ocampo's

20

conduct and/or Handi-Foil's conduct constituted misuse, such misuse completely bars any recovery by Ocampo. The court disagrees.

As an initial matter, PCMC misunderstands the difference between misuse as a complete bar to recovery and misuse as an affirmative defense that reduces a plaintiff's recovery. Misuse is a complete bar to recovery only if PCMC can defeat causation. "[A] manufacturer of a product can avoid all responsibility when evidence shows that another's conduct was the sole proximate cause of the injury." *Maxwell v. Hobart Corp.*, 576 N.E.2d 268, 271 (Ill. App. Ct. 1991). Misuse as a complete bar to recovery is not an affirmative defense—it is a challenge that the plaintiff cannot prove the causation element of her claim. Misuse as an affirmative defense, on the other hand, is a damage-reducer, not a complete bar. The misuse of affirmative defense merely "operates to reduce the plaintiff's recovery by the amount of fault apportioned to him." *Varilek*, 558 N.E.2d at 377; *Coney v. J.L.G. Indus., Inc.*, 454 N.E.2d 197, 204 (Ill. 1983). This is the case because when a defendant raises misuse as an affirmative defense, the defendant "concedes plaintiff's injuries were in part proximately caused by the defective product . . . ." *Wheeler v. Sunbelt Tool Co., Inc.*, 537 N.E.2d 1332, 1342 (Ill. App. Ct. 1989).

Neither *Lamkin v. Towner*, 563 N.E.2d 449 (Ill. 1990) nor *Woods v. Graham Engineering Corp.*, 539 N.E.2d 316 (Ill. App. Ct. 1989)—cases cited by PCMC—hold that an affirmative defense of misuse, if successful, completely bars recovery. In *Woods*, the court held that where an injury is caused by an alteration to the product by a third-party which makes the product unreasonably dangerous, the original manufacturer is not liable. 539 N.E.2d at 318. In other words, the causation element was defeated because the unreasonably dangerous condition was created by a third-party after the product left the manufacturer's control. In *Lamkin*, a case in

21

which the plaintiffs sued the manufacturer of a window screen after their children were injured by falling through the screen out the window, the Illinois Supreme Court stated that "neither a retailer nor a manufacturer can be held strictly liable for injuries resulting from the misuse of its product." 563 N.E.2d at 458. But the court was not discussing an affirmative defense of misuse. Rather, in affirming the dismissal of the complaint, the court explained that (i) strict product liability applies only to a condition that is unreasonably dangerous beyond an ordinary consumer's contemplation, (ii) that the purpose of window screens is to keep out insects, not to prevent a person from falling out a window, and (iii) that the window screens at issue "were simply serving the purpose for which they were created when the accidents occurred." *Id.* To put it another way, there was no unreasonably dangerous condition in the screens. Nothing in *Lamkin* overrules the Illinois Supreme Court's holding in *Coney,* 454 N.E.2d at 204, that an affirmative defense of misuse is not a bar to recovery in strict products liability cases.

In this case, PCMC did not raise a legally sufficient affirmative defense of misuse. To be clear, the court recognizes that PCMC plead misuse in its Third Affirmative Defense, stating that "Plaintiff's injuries or damages, if any, were caused by the unforeseeable misuse of the product by plaintiff or others, which was the sole, intervening cause of the damage alleged in plaintiff's complaint." (Ans. at 2.) In other words, PCMC contended that its product was not a proximate cause of Ocampo's injuries. As explained at trial, although designated as an affirmative defense, PCMC's Third Affirmative Defense really challenged the causation element of Ocampo's claim. Lack of proximate cause is *not* an affirmative defense, it is an attack on the sufficiency of Ocampo's claim. *Korando v. Uniroyal Goodrich Tire Co.*, 637 N.E.2d 1020, 1024-25 (Ill. 1994). Further, to raise a legally sufficient affirmative defense of misuse, PCMC would have had

22

to concede that Ocampo's "injuries were in part proximately caused by the defective product"—a concession that PCMC was not willing to make. *Wheeler*, 537 N.E.2d at 1342. Because PCMC did not raise a legally sufficient affirmative defense of misuse in this case, there was no basis to issue a jury instruction that misuse can warrant reduction of damages.[21]

More importantly, PCMC was not seeking to argue that Handi-Foil's or Ocampo's misuse warranted a reduction of damages. What PCMC wanted to—and was allowed to—argue was that misuse was a complete bar to recovery. Specifically, in an effort to defeat liability, PCMC was allowed argue that the sole proximate cause of Ocampo's injuries was her misuse and/or Handi-Foil's misuse of the machine. That was a challenge to the causation element of Ocampo's claim.[22] The court thus reiterates its ruling at trial that PCMC was entitled to argue that misuse, rather than a defect in its product, was the proximate cause of Ocampo's injuries. There was no need for an additional instruction, however, because the instructions adequately set forth the elements that Ocampo had to prove in order to prevail.

A few other points are worth noting. For one thing, PCMC's proposed jury instruction did not accurately state the law regarding misuse as a complete bar to recovery. For example, PCMC's instruction stated: "PCMC claims that this misuse [by Ocampo and/or Handi-Foil] was a proximate cause of Ms. Ocampo's injuries." But under Illinois law, misuse is a complete bar

---

[21]Moreover, even if a legally sufficient affirmative defense had been raised, PCMC would have to persuade the court that an instruction was warranted, given the IPI's recommendation that no jury instruction on misuse should be given. IPI 400.08. The court finds it unnecessary to address this issue further, however, given the fact that the affirmative defense of misuse was not at issue.

[22]PCMC was also allowed to argue for reduction of damages, based on its affirmative defense that Ocampo assumed the risk of injury and its third-party claim that Handi-Foil's negligence caused her injuries.

only if misuse is the *sole* proximate cause of the plaintiff's injuries. *See Maxwell*, 576 N.E.2d at 271 ("A manufacturer of a product can avoid all responsibility when evidence shows that another's conduct was the sole proximate cause of the injury.") Such flaws flowed over into the special interrogatories in PCMC's proposed verdict form. As for the proposed special interrogatories, the decision whether or not to use special interrogatories, as authorized by Rule 49(b) of the Federal Rules of Civil Procedure, "is committed to the discretion of the trial judge, the exercise of which basically is unreviewable." 9 A Wright & Miller, *Fed. Practice & Procedure: Civil 2d* § 2511 (1995). The court stands by its decision not to allow PCMC's proposed special interrogatories.[23]

Neither its decision not to instruct the jury regarding PCMC's misuse defense nor its decision to deny PCMC's proposed special interrogatories was erroneous. Accordingly, the court denies PCMC's motion for a new trial based on the court's refusal to instruct the jury on the misuse defense and refusal to include special interrogatories.

### D. PCMC's Motion for a New Trial Based on the Court's Denial of its Mistrial Motion

PCMC also seeks a new trial based on the court's denial of its motion for a mistrial. For the reasons that follow, PCMC's motion for a mistrial was properly denied, and thus does not provide grounds for a new trial.

Before explaining the basis for this ruling, some background information is warranted. During closing arguments, Handi-Foil's attorney commented twice that Ocampo had sued PCMC, not her employer, Handi-Foil. As soon as Handi-Foil's attorney finished his closing

---

[23]The fact that PCMC failed to recognize the distinction between misuse as an affirmative defense and misuse as a complete bar to recovery supports the court's decision.

argument,[24] outside the presence of the jury, PCMC moved for a mistrial on the grounds that the

attorney's comments improperly suggested that Ocampo did not sue Handi-Foil because she did

not believe her employer bore any responsibility for her injury, when in reality, Ocampo could

not have sued her employer as a matter of law due to the Illinois Workers' Compensation Act,

820 ILCS 305/1 *et seq.* Although the court agreed that the comments by Handi-Foil's attorney

were improper, the court denied PCMC's motion for a mistrial, but offered to give a curative

instruction. PCMC's counsel responded that he was not really looking for a mistrial, but wanted

the jury to be advised that Ocampo could not sue Handi-Foil. Handi-Foil's attorney countered

that if such an instruction were given, Handi-Foil would move for a mistrial. After taking the

matter under advisement during recess, the court reiterated its denial of PCMC's motion for a

mistrial, but struck the challenged portion of the closing argument, and instructed the jury as

follows:[25]

> During closing arguments, [Hand-Foil's attorney] pointed out that Ms. Ocampo
> has not sued her employer, Handi-Foil. I am striking that aspect of the closing
> argument, and directing you to disregard it. Under Illinois law, Ms. Ocampo
> could not have sued Handi-Foil for the injuries she sustained in the course of her
> employment at Handi-Foil.

The court also denied Handi-Foil's motion for a mistrial because Handi-Foil had created the

problem in the first place. PCMC now argues that striking the argument was not sufficient: the

---

[24]In a one-line argument with no supporting caselaw, Ocampo contends that by failing to make a contemporaneous objection during Handi-Foil's closing argument, PCMC failed to preserve the issue. Whether the objection was waived is a close call that the court need not reach because, in any event, PCMC's argument fails on the merits. *See United States v. Andreas*, 23 F. Supp. 2d 855, 859-860 (7th Cir. 1998) (depending on facts, objection raised after closing argument ended may be sufficiently timely to preserve objection).

[25]No transcript of the record is available. The court retained a written statement of the curative instruction, however, and also listened to the relevant portions of the court reporter's tape recording.

instruction to the jury did not cure counsel's error and PCMC was irreparably prejudiced by the comments and the court's refusal to grant a mistrial.

PCMC bears a heavy burden to persuade the court that improper remarks made during closing argument warrant a new trial. *Doe v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995). That burden has not been met here. Despite PCMC's arguments to the contrary, the curative instruction issued to the jury was sufficient to cure any prejudice to PCMC. The instruction accurately stated the law and was issued promptly to the jury. *See Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir. 1994) (mistrial not warranted where prejudicial impact of inadmissible testimony was cured by promptly striking the testimony and instructing the jury to disregard it.) Absent extraordinary circumstances, the assumption is that the jury will follow any curative instructions. *Id.* That assumption applies here. PCMC's motion for a new trial based on the court's denial of its motion for a mistrial is denied.

## II.    HANDI-FOIL'S POST-TRIAL MOTIONS

Handi-Foil also filed two post-trial motions, which the court addresses in turn. As explained below, the court finds that Handi-Foil is neither entitled to judgment as a matter of law, nor to a new trial.

### A.    Handi-Foil's Motion for a New Trial, Amendment of Verdict, and Judgment as a Matter of Law

In the first motion, filed under Rules 50 and 59 of the Federal Rules of Civil Procedure, Handi-Foil raises multiple arguments. Handi-Foil argues that it is entitled to judgment as a matter of law because the liability verdict against it was against the manifest weight of the evidence. Handi-Foil further maintains that it is entitled to a new trial because the verdict is

26

excessive, the court erred in refusing to admit evidence regarding Ocampo's prior reprimand, and the court erred both in instructing the jury that Ocampo could not have sued Handi-Foil and in denying Handi-Foil's motion for a mistrial.[26] The court has already addressed Handi-Foil's argument that the verdict is excessive and has explained why its decision to bar evidence regarding the prior reprimand does not warrant a new trial. *See* sections I.A and B, *supra*. The only open issues are whether Handi-Foil is entitled to judgment as a matter of law on the liability issue, and whether the court erred in instructing the jury that Ocampo could not sue her employer.

### 1. The Verdict Against Handi-Foil was Not Against the Manifest Weight of the Evidence

The first issue is whether Handi-Foil was entitled to judgment as a matter of law on PCMC's contribution claim. In ruling on a motion for judgment as a matter of law after a verdict has been entered, the court must limit its analysis to "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed[.]" *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000) (internal quotation marks and citation omitted). In other words, judgment as a matter of law is appropriate only if the court finds that no rational jury could have found Handi-Foil liable. *Id.* In conducting its analysis, the court may not make credibility determinations or weigh contested evidence. *Id.; see Reeves v.*

---

[26]Although Handi-Foil styles each of its arguments under both Rules 50 and 59, the only argument properly raised under Rule 50 is the argument that the liability verdict against Handi-Foil is against the manifest weight of the evidence. The remaining arguments do not relate to whether there is a legally sufficient evidentiary basis for a reasonable jury to find for Hand-Foil, and thus do not fall under Rule 50. *See* Fed. R. Civ. P. 50.

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Although Handi-Foil contends that it is entitled to judgment as a matter of law on PCMC's negligence-based contribution claim, the court disagrees. PCMC's theory was that Handi-Foil failed to provide Ocampo with a safe work environment, failed to provide proper and adequate instructions to Ocampo, and failed to properly supervise Ocampo and her co-workers. Handi-Foil maintains that it is entitled to judgment as a matter of law based on the stipulation that it was economically, practically and technologically feasible for PCMC to design and install a guard on the aluminum foil interfolder machine. That stipulation, however, does not establish that Handi-Foil was not negligent. There was testimony at trial that Ocampo was directed to climb into the machine to oil it while it was running or risk losing her job. There was also testimony that Handi-Foil failed to train Ocampo and her co-workers regarding how the aluminum foil interfolder's controls worked, including the emergency stop controls. Additionally, there was testimony that Handi-Foil may have removed an interlock guarding system. Based on this and other evidence presented at trial, the jury acted rationally in finding that Handi-Foil was negligent, and that such negligence was a proximate cause of Ocampo's injuries. To the extent Handi-Foil seeks judgment as a matter of law, its motion is denied.

### ii.     The Instruction to the Jury Was Not Erroneous

Handi-Foil also argues that the court erred when it instructed the jury that Ocampo could not sue Handi-Foil, and erred in denying Handi-Foil's motion for a mistrial, thus denying Handi-Foil a fair trial. The court cannot agree.

First, as explained in section I.D above, the instruction was necessary because during closing arguments, Handi-Foil's attorney twice stated that Ocampo chose not to sue her

28

employer, improperly insinuating that Ocampo did not believe Handi-Foil bore any responsibility for her injuries. Handi-Foil thus created a problem that the court had to clean up. If the court had not given the curative instruction, PCMC would have been prejudiced. Second, Handi-Foil concedes that the court's instruction to the jury accurately stated the law. Third, Handi-Foil's claim that it was irreparably prejudiced by the instruction lacks merit. According to Handi-Foil, it was prejudiced because the instruction "effectively deprived Handi-Foil of its right to have its (or counsel's) credibility [determined] by the jury." (Handi-Foil's Mot. for a New Trial at 6.)[27] Handi-Foil relies on two criminal cases, *Stevens v. United States*, 306 F.2d 834, 838 (5th Cir. 1962) and *Hance v. United States*, 299 F.2d 389, 398 (8th Cir. 1962), but those cases are inapposite and fail to support its argument. In *Stevens* and *Hance*, the judges committed reversible error by expressing their views regarding the credibility of certain witnesses. *Stevens*, 306 F.2d at 838 (reversible error where judge took the issue of credibility away from the jury by stating that a certain witness was not credible); *Hance*, 299 F.2d at 398 (during charge to jury, judge stated that, in his opinion, one witness was a "brave, dedicated public servant" who "does not deserve the label of 'liar' . . . .") Here, in contrast, the court made no comments regarding the credibility of any party or its counsel. Rather, in a neutral manner, the court instructed the jury to disregard a small portion of Handi-Foil's closing argument, stating that under Illinois law, Ocampo could not have sued her employer. The court's instruction was no different than granting a motion to strike testimony that is deemed inadmissible. When a judge rules on evidentiary objections and motions to strike testimony, the judge is not commenting on the credibility of a party or its counsel. The court properly issued the curative instruction and denied

---

[27]Docket entry 63.

Handi-Foil's motion for a mistrial. Accordingly, Handi-Foil's request for a new trial is denied.

## 2. Hand-Foil's Motion to Reduce the its Contribution Exposure Pursuant to *Kotecki*

Handi-Foil also moves the court to reduce its contribution exposure to the amount of its liability to Ocampo under the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1 *et seq.* It is undisputed that under *Kotecki v. Cyclops Welding Corp.*, 585 N.E.2d 1023, 1027-1028 (Ill. 1991), Handi-Foil's liability for contribution is limited to its statutory liability under the IWCA. The amount of Handi-Foil's past and future liability under the IWCA, however, is disputed. According to Handi-Foil, its insurer has paid $469,129.12 in workers' compensation benefits so far, and anticipates any future exposure to be between $50,000 and $100,000. Handi-Foil thus asks the court to reduce its contribution exposure to an amount between $519,129.12 and $569,129.12. Ocampo, on the other hand, argues that the past workers' compensation benefits amount to only $250,000. As for future liability, both Ocampo and PCMC contend that the Industrial Commission, not the court, must make that determination. Additionally, there is a third dispute between Ocampo and Handi-Foil regarding whether Handi-Foil is liable to Ocampo for statutory attorneys' fees and costs under Section 5(b) of the IWCA, 820 ILCS 305/5(b). For the reasons explained below, the court finds that the past workers' compensation benefits amount to $241,091.10. On the issues of Handi-Foil's liability for future workers' compensation benefits and for statutory fees and costs, the court is setting Handi-Foil's motion for an additional hearing. As a result, Handi-Foil's *Kotecki* motion is entered and continued.

### i. The IWCA

Some general information regarding the IWCA is helpful before the court addresses the

30

various disputes. Under the IWCA, when a covered employee is injured on the job, the employer may be liable to pay benefits provided under the Act, whether or not the employer is at fault for the injury. *See* 820 ILCS 305/5(a). If the injury was caused by circumstances under which a third party (*i.e.*, someone other than the employer) is legally liable for the employee's damages, the employee may sue the third party to recover damages, notwithstanding the fact that the employee has received or will receive workers' compensation benefits from her employer. *LaFever v. Kemlite Co.*, 706 N.E. 2d 441, 451 (Ill. 1998); 820 ILCS 305/5(b). In the event the employee succeeds in her personal injury lawsuit, any settlement or judgment is subject to an employer's lien "in an amount equal to the amount of workers' compensation due the [employee]." *LaFever*, 706 N.E. 2d at 451. Out of any reimbursement the employer receives from the employee, the employer is obligated to pay 25% of the reimbursed amount toward the employee's attorney's fees as well as its *pro rata* share of costs. *E.g.*, *Zuber v. Ill. Power Co.*, 553 N.E.2d 385, 388-389 (Ill. 1990); 820 ILCS 305/5(b).

Further, in cases in which both the employer and a third-party bear legal responsibility for the employee's injury, the third-party tortfeasor is entitled to sue the employer for contribution. As explained earlier, the employer's liability for contribution is limited to its statutory liability under the IWCA. *Kotecki*, 585 N.E.2d at 1027-1028. To avoid or satisfy liability for contribution, the employer may waive its workers' compensation lien. *LaFever*, 706 N.E.2d at 399. The decision to waive the lien may be made even after the jury has returned a verdict on the employee's personal injury claim and the third-party's contribution claim. *Id.* at 399-400. By waiving its lien, the employer satisfies any judgment that has been entered against it for contribution. *See Kim v. Alvey, Inc.*, 749 N.E.2d 368, 376 (Ill. App. Ct. 2001). If the employer

waives its lien, that amount is setoff against the verdict, reducing the amount the third-party owes to the employee. *See, e.g.*, *LaFever*, 706 N.E.2d at 446 (where employer waived lien after being found liable for contribution, court granted setoff to reduce amount of judgment owed by third-party by the amount of the lien); *Kim*, 749 N.E.2d at 379 (defendants entitled to contribution from plaintiff's employer generally have a right to a credit or setoff of the amount of workers' compensation paid to plaintiff). In addition, if the employer waives its lien, the employer has no legal obligation to pay the employee a portion of the attorneys' fees and costs incurred to bring the personal injury lawsuit. *LaFever*, 706 N.E.2d at 400.

With this understanding of the IWCA and its relationship to an employer's contribution liability in mind, the court turns to the disputes at issue.

### *ii.* *Past Workers' Compensation Benefits*

The first dispute relates to the amount of workers' compensation benefits that Ocampo has already received: according to Handi-Foil, the past benefits amount to $469,129.12, whereas Ocampo maintains that the number is closer to $250,000. The court held an evidentiary hearing for Handi-Foil to prove up the amount claimed. The evidence introduced at the hearing established that Handi-Foil's insurance company, One Beacon Insurance Group ("One Beacon"), hired Paradigm Health Corporation ("Paradigm") as a case manager to handle Ocampo's claim. Paradigm manages workers' compensation claims for catastrophic injury cases like Ocampo's. Under the contract with Paradigm, One Beacon paid Paradigm $431,548.00,[28] and Paradigm

---

[28]Handi-Foil argues that its past workers' compensation liability amounts to $469,129.12. But the evidence presented at the evidentiary hearing established that Handi-Foil's insurer paid $431,548.00 to Paradigm, and there was no evidence of additional amounts paid by or on behalf of Handi-Foil. Accordingly, based on the evidence presented, the maximum extent of Handi-Foil's past workers' compensation liability is $431,548.00, not $469,129.12.

undertook responsibility to manage medical costs, coordinate Ocampo's medical care, and pay Ocampo's medical providers. Paradigm basically acted as a third-party administrator, assigning a nurse manager to coordinate Ocampo's care. Out of the $431,548.00 contract price, Paradigm paid $241,091.10 for Ocampo's medical bills. The remaining $190,459.90 was Paradigm's profit on the contract. Relying on *Cole v. Byrd*, 656 N.E.2d 1068 (Ill. App. Ct. 1995), Ocampo argues that only the medical expenses paid on her behalf should count toward Handi-Foil's workers' compensation liability—Paradigm's profit on the contract should be excluded because that amount was not for the benefit of Ocampo.

The question presented in *Cole* was whether a party seeking reimbursement on a workers' compensation lien is entitled to reimbursement of fees paid to a professional rehabilitation management company engaged as a consultant by the employer's insurer. *Id.* at 1069-1070. Specifically, in seeking reimbursement under the lien, the employer's insurer sought repayment of $12,577.96 for services provided by a registered professional nurse employed by the rehabilitation management company, who acted as a consultant to ensure that the injured employee received the necessary and appropriate medical care. *Id.* at 1070. The IWCA authorizes reimbursement for necessary medical and rehabilitation services, not for an insurer's expenses, even though the insurer's expenses may in some way provide a benefit to an injured employee. *Id.* at 1073. Accordingly, to determine whether the consultant's fee was reimburseable under the IWCA, the court considered whether the consultant's services were "necessary medical services 'reasonably required to cure or relieve [the employee] from the effects of the accidental injury.'" *Id.* (quoting 820 ILCS 305/8a). Finding that the consulting nurse's role was to manage and supervise medical treatment provided by others, and that the

33

services were principally on behalf of the insurer, the court ruled that the consulting nurse did not provide necessary medical or rehabilitative services. *Id.* Accordingly, the court in *Cole* ruled that the consultant's fee was not compensation that had been rendered to the employee. *Id.*

Based on *Cole*, the court agrees that Paradigm's fee, or profit, on the contract with One-Beacon was not compensation provided to Ocampo under the IWCA, and thus is not part of Hand-Foil's workers' compensation lien. Like the consulting nurse in *Cole*, Paradigm did not administer any medical or rehabilitative care. Rather, Paradigm essentially provided case management services, managing and supervising medical treatment provided by others. By engaging Paradigm, One Beacon was able to guarantee its costs. Through its contract with Paradigm, One Beacon ensured that its exposure would not exceed the contract price, even if the actual expenses for Ocampo's medical and rehabilitation needs exceeded the contract price.[29] Handi-Foil offers no persuasive argument to distinguish its case from *Cole*. The court thus concludes that out of the $431,548.00 contract price One Beacon paid to Paradigm, only the amount of money Paradigm paid to Ocampo's treating providers constitutes workers' compensation. As a result, in calculating Handi-Foil's past workers' compensation liability, the court excludes Paradigm's $190,459.90 profit. Handi-Foil's past workers' compensation liability thus amounts to $241.091.10, the amount Paradigm paid for Ocampo's medical bills.

---

[29] As Tom Schell, Paradigm's vice president for strategic partnerships, explained, managing workers' compensation claims for catastrophic injury cases involves an element of financial risk-taking. Paradigm sets its contract price after assessing what medical and rehabilitation services will likely be needed and adds in a profit margin. Paradigm's assessment, which typically takes place within 2-3 weeks of the injury, requires an estimation of what types of treatment will be necessary, how long treatment will take, assessing the likelihood of the patient taking turns for the worse, etc. The patient's situation could turn out very differently than anticipated. If the patient's medical and rehabilitation services end up costing more than the contract price, Paradigm absorbs the extra cost. To put it simply, while Paradigm hopes to make a profit on its contracts (and may make a large profit, as it did here), it also accepts the risk of breaking even or even losing money.

### *iii. Future Workers' Compensation Benefits*

The next issue is whether the court has authority to determine the amount of Ocampo's future workers' compensation benefits. According to counsel, Ocampo has a case before the Illinois Industrial Commission regarding her workers' compensation claim, which has not yet been arbitrated or settled. Handi-Foil contends that the court should determine the amount of its future workers' compensation liability—which it estimates falls between $50,000 and $100,000—then reduce the judgment against it to the total amount of its past and future workers' compensation liability. Ocampo and PCMC, on the other hand, maintain that the Industrial Commission, not the court, must make any determination regarding future workers' compensation benefits owed to Ocampo. After reviewing the case they cite in support of their position, *Branum v. Slezak Construction Co.*, 682 N.E.2d 1165 (Ill. App. Ct. 1997), the court agrees with Ocampo and PCMC.

In *Branum*, an injured construction worker brought a successful personal injury action against a general contractor and a steel company. The general contractor likewise prevailed in its contribution claim against the plaintiff's employer. *Id.* at 1167-1168. After the jury returned its verdict, the employer waived its statutory right to reimbursement from its employee for past and future workers' compensation payments. *Id.* at 1175. At the request of the general contractor and steel company, the trial court then reduced the judgment against them by the amount of the employer's lien waiver. *Id.* In reducing the judgment, the trial court granted a setoff for past workers' compensation benefits already paid, as well as a setoff for the present cash value of the plaintiff's future workers' compensation benefits, based on a stipulation from the defendants. *Id.* at 1177. The appellate court held that unless there was an agreement between all parties,

35

including the plaintiff, "a setoff of workers' compensation benefits cannot be made until the amount of workers' compensation benefits to which plaintiff is entitled is fully determined." *Id.* at 1178-1179. As a result, the appellate court reversed the setoff for future workers' compensation benefits because the Industrial Commission had not yet made a determination regarding those benefits. *Id.*

Following *Branum*, the court cannot grant a setoff against the judgment for Ocampo's future workers' compensation benefits until the issue has been resolved by the Industrial Commission, unless the parties reach a stipulation.[30] The court directs the parties to discuss whether they are willing to enter a stipulation. Alternatively, the parties should consider other options, including but not limited to whether a designated, estimated amount should be placed in escrow by PCMC or Handi-Foil (or both) until the Industrial Commission resolves the issue. The court notes that Ocampo seems to object to both options, but has not presented a practical alternative. The parties are expected to appear at the next hearing either with an agreement, or if no agreement can be reached, with practical suggestions, preferably supported by legal authority.

### iv. *Handi-Foil's Liability for Attorneys Fees & Costs under Section 5(b)*

An additional issue that came up during briefing is whether Handi-Foil must pay Ocampo

---

[30]Relying on *Glenn v. Johnson*, 764 N.E.2d 47 (Ill. 2002), Handi-Foil contends that the court has authority to assign a value to Ocampo's future workers' compensation benefits. The court does not read *Glenn* so broadly, however. In *Glenn*, one of the issues was the amount of credit the trial court gave to the employer for future workers' compensation payments in adjudicating its lien. *Id.* at 48. Finding insufficient evidence in the record to properly analyze the issue, the Illinois Supreme Court remanded the case, directing the trial court to reevaluate the employer's right to credit for future payments based on the rulings in *In re Estate of Dierkes*, 730 N.E.2d 1101 (Ill. 2000) and *Zuber*, 553 N.E.2d 385 (Ill. 1990). *Id.* Significantly, in both *Dierkes* and *Zuber*, the amounts of the future workers' compensation awards had already been determined. *Dierkes*, 730 N.E.2d at 1103 (employer and employee settled workers' compensation claim); *Zuber*, 553 N.E.2d at 386 (Industrial Commission made determination). Here, where there has been no determination regarding Ocampo's future compensation benefits, the court follows the decision in *Branum*, which directly addressed the issue at hand.

36

statutory attorneys' fees and costs under section 5(b) of the IWCA, 820 ILCS 305/5(b). Handi-Foil argues it is not liable for fees, contending that there is no duty to reimburse attorneys fees and costs where the employer is not reimbursed for its workers' compensation lien. In making this argument, Handi-Foil relies *LaFever, supra*, in which the Illinois Supreme Court held that an employer's waiver of its lien not only constitutes satisfaction of its contribution liability, but also means that the employer is not liable to its employee for attorneys' fees and costs under section 5(b). The problem with Handi-Foil's argument, however, is that Handi-Foil has neither waived its lien nor sought leave to do so. Perhaps Handi-Foil was waiting for the rulings on its other post-trial motions before deciding whether to waive its lien.[31] Regardless, it is not too late to waive the lien, if that is Handi-Foil's intention. *See Kim*, 749 N.E.2d at 375-376. At the next hearing, Handi-Foil shall inform the court whether it wants to waive its lien. In the event that Handi-Foil opts not waive its lien, the court will analyze its liability for section 5(b) attorneys fees and costs based on the language of the IWCA and the case law, including *Silva v. Electrical Systems, Inc.*, 701 N.E.2d 506 (Ill. 1998).

## III. CONCLUSION

For the reasons explained above, the following motions are denied: (1) PCMC's motion for a new trial on grounds that the verdict was excessive; (2) PCMC's motion for a new trial based on the court's exclusion of a prior reprimand issued to plaintiff; (3) PCMC's motion for a new trial based on the court's refusal to instruct the jury on the misuse defense and refusal to

---

[31]If, for example, the judgment were remitted to $875,000 as Handi-Foil argued, its contribution liability would have been $218,750 (25% of the judgment), which is less than the value of its workers' compensation lien. If the amount of its lien was greater than Handi-Foil's contribution liability, Handi-Foil likely would likely seek reimbursement of its lien.

include special interrogatories; (4) PCMC's motion for a new trial based on the court's denial of its mistrial motion; and (5) Handi-Foil's motion for a new trial, amendment of verdict, and judgment notwithstanding the verdict. Hand-Foil's motion to reduce the its contribution exposure pursuant to *Kotecki* is entered and continued; the motion is set for an additional hearing on August 31, 2005 at 2:30 p.m.

ENTERED:

Nan R Nolan

NAN R. NOLAN
Dated: August 12, 2005                         United States Magistrate Judge